UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ANN ALBRECHT,                      )
                                   )
                Plaintiff,         )
                                   )
        v.                         )    No.  4:08CV1764 FRB
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
                Defendant.         )

## MEMORANDUM AND ORDER

This cause is before the Court on plaintiff's appeal of an adverse ruling of the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On November 8, 2006, plaintiff Ann Albrecht filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Act, 42 U.S.C. §§ 1381, et seq., in which she alleged that she became disabled on May 25, 2006.  (Tr. 77-82, 83-90.)  Plaintiff subsequently amended her onset date to November 10, 2006.  (Tr. 76.)  On initial consideration, the Social Security Administration denied plaintiff's claims for benefits.  (Tr. 49, 50, 51-54.)  On March 26, 2008, upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ).  (Tr. 21-48.)

Plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. On April 8, 2008, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 1-10.) On August 8, 2008, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 15-17.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on March 26, 2008, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff was forty-eight years of age. Plaintiff completed high school and subsequently obtained an associates degree in business as well as a degree as a Licensed Practical Nurse. (Tr. 23-24.) Plaintiff lives with her husband and two children, seven-year-old twins. (Tr. 39.) Plaintiff has an older son who does not live with her. (Tr. 42.) Plaintiff collected unemployment compensation in 2006. (Tr. 26.)

In her Disability Report, plaintiff reported that she worked in electrical sales from 1989 to 1994. (Tr. 109.) Plaintiff testified that in 1995 and 1996, she managed small restaurants. (Tr. 25.) From 1996 to May 2006, plaintiff worked as an assistant manager in real estate. (Tr. 109.) Plaintiff reported that she stopped working in May 2006 because the company for whom she worked was sold. (Tr. 108.)

Plaintiff testified that she had surgeries for carpal tunnel in 1993 or 1994, but that she currently experiences no difficulties from the condition. (Tr. 28.) Plaintiff testified that she had surgery on her right shoulder in 1995 or 1996, and that she currently experiences some pain and weakness resulting in an inability to use her arm at times. (Tr. 28-29.) Plaintiff testified that she had an adrenal mass removed in 1999 and experiences no residual effects therefrom. (Tr. 30.)

Plaintiff testified that she was diagnosed with rheumatoid arthritis in 1996 or 1997 and experiences pain daily on account of the condition. (Tr. 31.) Plaintiff testified that the pain sometimes affects her entire body, but that some days it affects only her right hip and arm. Plaintiff testified that she takes ibuprofen which somewhat reduces swelling, and that she was recently prescribed additional medication for the condition. (Tr. 32.)

Plaintiff testified that in January 2007, her rheumatologist informed her that test results were negative for lupus but that such negative results were on account of medications, including steroids, taken over the years which cause false negatives. Plaintiff testified that she had previously tested positive for lupus. (Tr. 27-28.) Plaintiff testified that despite the negative test results, the rheumatologist prescribed medication for lupus, but that such medication did not help her condition. (Tr. 32.) Plaintiff testified that she was currently

taking Prednisone and, as such, any additional lupus tests would likewise have negative results. (Tr. 28.)

Plaintiff testified that the lupus causes a lot pain, memory loss, anemia, and multiple infections. Plaintiff testified that she suffers from migraine headaches on account of the lupus and rheumatoid arthritis. Plaintiff testified that pain radiates from her spine, through her neck and to her head. Plaintiff testified that she was currently suffering from a migraine headache which she had had for over two months. Plaintiff testified that medication, including pain medication from her physician, does not help the headaches. (Tr. 33-34.)

Plaintiff testified that she also suffers from lichens planus and Sjogren's syndrome, both of which are connective tissue diseases. Plaintiff testified that Sjogren's syndrome causes sores to form in her mouth. Plaintiff testified that lichens planus causes sores to form in her mouth, throat and over her body. Plaintiff testified that she experiences itching, swelling and scarring on account of the conditions. Plaintiff testified that she has difficulty swallowing and takes Prednisone to reduce swelling. (Tr. 34-35.)

Plaintiff testified that she was diagnosed with fibromyalgia and that touch to the pressure points causes great pain. Plaintiff testified that she has also been diagnosed with acromegaly, a growth hormone condition, which causes abnormal growth of various parts of the body. Plaintiff testified that her

doctors suspect that her jaw may be enlarged, and that they are currently monitoring the condition. (Tr. 35.)

Plaintiff testified that she experiences neuropathy in her hands, feet, and right leg. Plaintiff testified that she has dropped things on account of the condition and has burnt her hands on the stove because she could not feel the burning sensation. Plaintiff testified that she has numbness and coldness in her toes and fingers. Plaintiff testified that her physicians advised her that the condition is mostly likely related to her lupus and fibromyalgia and that there was not a lot that could be done for the condition. (Tr. 36.)

Plaintiff testified that she also has restless leg syndrome but that she does not take medication for the condition because she and her physicians are working with her other conditions that cause greater pain. (Tr. 37.)

Plaintiff testified that a brain tumor was recently discovered and that her neurologist advised her that the benefits of treatment may not outweigh potential negative outcomes, given the other physical problems plaintiff experiences. (Tr. 30.) Plaintiff testified that the tumor is located on the pituitary gland and causes sinus infections and headaches. (Tr. 36-37.) Plaintiff testified that her physicians advised her that her memory loss and acromegaly could likewise be caused by the tumor. (Tr. 37.)

As to her exertional abilities, plaintiff testified that

she can sit for up to half an hour without having to move about. Plaintiff testified that she can stand for five to ten minutes if she is leaning against something. Plaintiff testified that she usually does not "free stand." (Tr. 37.) Plaintiff testified that she cannot walk long distances without stopping. Plaintiff testified that she has difficulty lifting a gallon of milk without a lot of pain. Plaintiff testified that she has difficulty with grasping, reaching and working with computers because of the tingling and numbness she experiences in her fingers. (Tr. 38.) Plaintiff testified that she has difficulty raising her arms above her head because of pain. (Tr. 39.) Plaintiff testified that she cannot climb stairs without a lot of pain. Plaintiff testified that she can ascend her back stairs, which consist of three steps, without too much help if she is holding onto the wall. (Tr. 38-39.) Plaintiff testified that she is unable to bend over. (Tr. 39.) Plaintiff used a cane at the hearing and testified that she has had to use the cane during the recent six to eight months. Plaintiff testified that she uses the cane only when she is "in the most pain" and unstable on her feet. (Tr. 27.)

    As to her daily activities, plaintiff testified that she would like to stay in bed until 6:00 a.m., but that insomnia and pain may awaken her at 3:00 a.m. and she is sometimes unable to get back to sleep. (Tr. 39-40.) Plaintiff testified that her husband helps her with her shower or bath, and that her daughter has recently begun to help brush her hair because of plaintiff's

increasing difficulty in her ability to do so. (Tr. 40.) Plaintiff testified that she cooks two or three times a week, and may cook four times during a good week. Plaintiff testified that, otherwise, her husband does the cooking. Plaintiff testified that she can no longer do housework. Plaintiff testified that she does laundry once a week with help from her children. Plaintiff testified that she can fold two loads of laundry without too much difficulty. (Tr. 40-41.) Plaintiff testified that she usually lies on the couch or on the bed during the day and watches television. Plaintiff testified that she has difficulty reading due to blurred vision caused by Sjogren's syndrome. Plaintiff testified that she does not go anywhere to visit anyone because she is not comfortable, but that she receives visitors at times. (Tr. 41.) Plaintiff testified that she drives two or three times a week, and sometimes drives her children to school, which is a six-mile drive. Plaintiff testified that she drove to the hearing site accompanied by her husband. (Tr. 41-42.) Plaintiff testified that she goes to the grocery store once or twice a week, but that someone usually accompanies her. Plaintiff testified that she is able to walk at the store by leaning on a cart, but that she often rides in a scooter. Plaintiff testified that she attends church once or twice a month. (Tr. 42.) Plaintiff testified that she also participates with scouting activities, but that other parents are assuming additional responsibilities because she has had to reduce her role. (Tr. 43.)

B.    Testimony of Vocational Expert

Dr. Jeffrey McGrowsky, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ asked Dr. McGrowsky to assume an individual forty-six years of age, with sixteen years of education, to have the same past work experience as plaintiff. (Tr. 43.) The ALJ asked Dr. McGrowsky to assume such individual to be able to

> lift and carry 20 pounds occasionally, 10 pounds frequently. Stand or walk for six hours out of eight, sit for six, can occasionally climb stairs and ramps, never ropes, ladders, and scaffolds. Reaching overhead is limited to no repetitive on the right. Should avoid concentrated exposure to extreme cold, vibration, and hazards at unprotected heights.

(Tr. 43-44.)

Dr. McGrowsky testified that such a person could not perform plaintiff's past relevant work on account of the restricted use of the arms. The ALJ clarified that the restriction on use of the arms was "[r]eaching overhead is limited to no repetitive on the right only." (Tr. 44.) Dr. McGrowsky then opined that such an individual could perform light and skilled work, such as plaintiff's past work in electrical sales, as an assistant apartment manager, and in managing a restaurant. Dr. McGrowsky opined that such a person may not be able to perform the work as plaintiff performed it, but that the person could perform the work as it is performed in the national economy. (Tr. 44.)

The ALJ then asked Dr. McGrowsky to assume the individual could lift ten pounds occasionally and less than ten pounds frequently; could stand or walk for two hours out of an eight-hour work day; and could sit for six hours. Dr. McGrowsky testified that such a person could not perform plaintiff's past relevant work. (Tr. 44.) Dr. McGrowsky opined that such a person could perform sedentary work such as telephone sales, of which 10,000 such jobs exist in the State and over one million in the national economy; and as an order clerk, of which 6,000 such jobs exist in the State and over 300,000 in the national economy. (Tr. 45.)

Plaintiff's counsel asked Dr. McGrowsky to assume that the individual was also limited to sitting less than thirty minutes without having to get up to stretch. (Tr. 45-46.) Dr. McGrowsky testified that if such a person had to get up and stretch within such periods, she would be able to perform the jobs previously described. Dr. McGrowsky testified that an individual would have to be able to sit at least twenty to thirty minutes during an hour. (Tr. 46.)

Dr. McGrowsky testified that the position in telephone sales would require occasional reaching and handling, and frequent fingering; and that the position of order clerk would require more use of the hands. Dr. McGrowsky testified that there would be some writing involved with those positions, but that use of computer skills would be minimal. (Tr. 47.)

### III. Medical Records

On June 22 and July 8, 1998, plaintiff visited Dr. David
T. Howell with complaints of multiple oral ulcers. Prednisone[1] was
prescribed. (Tr. 208, 209.)

Plaintiff visited Dr. Howell on October 20, 1998, who
noted plaintiff's history of severe hypoglycemia. Plaintiff
reported experiencing dizziness and vertigo for two days, with
feelings of lightheadedness and nausea for six days. Plaintiff
also reported feelings of tiredness, fatigue, sweating, heart
palpitations, blurred vision, and double vision. Plaintiff was
prescribed Antivert,[2] and laboratory testing was ordered. (Tr.
207.)

Plaintiff visited Dr. Jonathan Bortz of the Bortz
Diabetes Control Center on February 10, 1999, and reported that she
had been diagnosed eighteen years prior with hypoglycemia.
Plaintiff reported that she had been mainly healthy throughout the
years. Plaintiff reported that she began experiencing anxiety
attacks with dizziness, chest pressure, palpitations, increased
thirst, and blurred vision in October 1998, and that lab work at

_____

[1]Prednisone is a corticosteroid used to reduce swelling and
redness and to treat certain conditions, such as arthritis and
lupus, by changing the way the immune system works. Medline Plus
(last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a601102.html>.

[2]Antivert is used to prevent and treat nausea, vomiting and
dizziness caused by motion sickness. Medline Plus (last reviewed
Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a682548.html>.

that time showed an elevated insulin level and C-peptide level. Plaintiff reported that she had repeated onset of these symptoms within the previous two weeks. Plaintiff also reported experiencing headaches, fatigue, occasional nausea, constipation, and diarrhea. Plaintiff reported that she sometimes felt as though she would pass out, and that she sometimes felt so ill that she could not function during the day. (Tr. 140.) Physical examination was unremarkable. Dr. Bortz determined to repeat the labs previously performed but with plaintiff in a fasting state. Dr. Bortz opined that plaintiff's history did not suggest hypoglycemia and that an elevated insulin level in a non-fasting state was not necessarily significant. (Tr. 141.) Upon review of the results of the subsequent labs, Dr. Bortz opined that it was unlikely that plaintiff's symptoms could be attributed to hypoglycemia. (Tr. 139.)

Plaintiff visited Dr. Howell on May 6, 1999, and reported having had an "attack" in which she felt as though she was passing out. Plaintiff reported feelings of dizziness, nausea, chest pain, heart palpitations, and headache. Dr. Howell reviewed recent laboratory results and questioned whether plaintiff had pheochromocytoma.[3] Dr. Howell determined to order a CT scan of plaintiff's adrenal glands. (Tr. 206.)

---

[3]Pheochromocytoma is a rare tumor, usually benign, that starts in the cells of one of the adrenal glands and often causes the adrenal gland to make too many hormones. Medline Plus (last updated Sept. 16, 2010)<http://www.nlm.nih.gov/medlineplus/pheochromocytoma.html>.

Plaintiff visited Dr. Howell on May 25, 1999, and complained of right shoulder pain. Dr. Howell noted plaintiff's history of having right rotator cuff repair. A steroid injection was administered. Plaintiff was also provided medication for contact dermatitis. (Tr. 205.)

A limited CT scan of the adrenal glands performed on June 3, 1999, showed a nodule on the left adrenal gland, noted to be a probable pheochromocytoma. (Tr. 225.)

On June 9, 1999, plaintiff visited Dr. Howell who noted the recent CT scan of the abdomen to show a nodule on the left adrenal gland. Dr. Howell diagnosed plaintiff with pheochromocytoma and referred plaintiff to a surgeon. (Tr. 204.)

Plaintiff visited Dr. Christopher S. Cronin of St. Louis Surgical Consultants on July 1, 1999, for consultation regarding her recently diagnosed left adrenal pheochromocytoma. Dr. Cronin recommended laparoscopic adrenalectomy, and preparation for surgery was discussed. (Tr. 144.)

Plaintiff underwent laparoscopic left adrenalectomy on July 21, 1999, in response to plaintiff's episodes of hypertension and tachycardia. During surgery, Dr. Cronin discovered a cortical adenoma.[4] No pheochromocytoma was found. (Tr. 142, 148, 153-54, 155.) Follow up examination on July 30, 1999, showed plaintiff to be totally asymptomatic and doing well. Dr. Cronin noted plaintiff

---

[4]Benign tumor on the outer surface of an organ. Stedman's Medical Dictionary 25, 399 (26th ed. 1995).

to remain normotensive and to have had no additional attacks of tachycardia or headaches. (Tr. 142.)

On a date unknown in 2000, plaintiff visited Dr. Howell with complaints of chest pain, palpitations, and headaches with nausea. Dr. Howell noted thyroid laboratory results to be normal. (Tr. 203.)

An exercise ECG performed on January 19, 2000, was negative for exercise-induced ischemia. It was noted that plaintiff was started on a thirty-day event monitor that same date. (Tr. 215.)

On February 7, 2001, plaintiff visited Dr. James S. Bonner of the St. Louis Neurological Institute for evaluation of headaches. Plaintiff reported that she had experienced headaches intermittently for years but that they had recently worsened. Plaintiff reported having two or three headaches a week, but that she could also go two or three weeks between headaches. Plaintiff reported that she experiences pounding, photophobia, phonophobia, avoidance of activity, tactile sensitivity, and occasional nausea and vomiting during such headache episodes. Plaintiff reported that she took ibuprofen and Imitrex[5] for the headaches and achieved better results with ibuprofen. Review of systems was positive for fatigue, headaches and dizziness; loss of vision in the right eye

_____

[5]Imitrex is used to treat the symptoms of migraine headaches by stopping pain signals from being sent to the brain. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601116.html>.

with headaches; occasional fainting; cough, shortness of breath and thirst; and back pain, neck pain, joint pain, and joint swelling. (Tr. 145.) Neurological examination was unremarkable. Motor examination showed good power, tone and bulk. Fine manipulation was good. Plaintiff was able to heel, toe and tandem walk. Dr. Bonner opined that plaintiff suffered from migraine headaches and he prescribed Amitriptyline[6] as a prophylactic. Dr. Bonner recommended that plaintiff undergo an MRI given her report of visual loss with her headaches. (Tr. 146.)

Plaintiff visited Dr. Howell on May 21, 2001, and reported experiencing blindness with aura, and a rash on her neck. Plaintiff was referred to an ophthalmologist and a dermatologist. (Tr. 202.)

Plaintiff visited Dr. Howell on May 2, 2002, and complained of asthenia,[7] bilateral knee pain, skin rash, blind spots, dry eyes with blurred vision, and decreased memory. Plaintiff also complained of having a migraine headache for three to four weeks. Physical examination showed crepitus of the knees with plaintiff unable to flex her knees. Dr. Howell ordered an MRI of the brain and laboratory testing. (Tr. 201.)

Laboratory testing performed on May 3, 2002, yielded

---

[6]Amitriptyline, used to treat symptoms of depression, is also used to prevent migraine headaches. Medline Plus (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html>.

[7]Weakness or debility. Stedman's Medical Dictionary 158 (26th ed. 1995).

negative results for antibodies indicative of lupus and Sjogren's syndrome. (Tr. 237, 238.) Anti-nuclear antibodies (ANA) were noted to be equivocal; however, plaintiff's rheumatoid factor was noted to be elevated. (Tr. 239.)

X-rays taken of both knees on May 7, 2002, in response to plaintiff's complaints of joint pain yielded negative results. (Tr. 221.)

An MRI of the brain and brain stem performed May 7, 2002, showed a non-enhancing lesion on the left side of the pituitary gland, likely to be a pituitary microadenoma (small tumor). Otherwise, the MRI yielded negative results. (Tr. 220.)

Plaintiff visited Dr. Howell on May 14, 2002, and complained of a recent onset of blindness in the medial visual field. Dr. Howell noted plaintiff's diagnoses of hypoaldosterone, Addison's Disease, pituitary gland adenoma, and rheumatoid arthritis. Progressive blindness was noted and plaintiff was instructed to go to the emergency room. (Tr. 200.)

On May 14, 2002, plaintiff went to the emergency room at St. Luke's Hospital complaining of headaches and visual loss. It was noted that plaintiff had recently been diagnosed with pituitary microadenoma and asthenia. A CT scan was normal. Results of laboratory testing were within normal limits. Plaintiff was admitted to the hospital for observation and diagnosis of possible chronic hypoadrenalism, Addison's disease, and evaluation of her pituitary adenoma. Plaintiff also reported having generalized

fatigue for approximately one month, such that she had difficulty keeping up with her two-year-old twins. Plaintiff also reported that she had gained weight, had bilateral knee pain, and had central vision loss. Plaintiff was admitted to the hospital and was treated over three days with Midrin[8] and Depakote.[9] It was determined that plaintiff's headaches were due to complicated migraine and not on account of the pituitary tumor inasmuch as the tumor was not pressing on the optic chiasm. Plaintiff was discharged on May 17, 2002, with discharge diagnoses of pituitary microadenoma, nonsecretory; complicated migraine headache with visual loss; and chronic hypoaldosterone secondary to adrenalectomy. Plaintiff's discharge medications included Midrin, Depakote and Prednisone. (Tr. 147, 149-50, 151-52, 219.)

Plaintiff visited Dr. Howell on May 21, 2002, and complained of migraine headaches with visual symptoms. It was noted that plaintiff was taking Depakote and Midrin. Dr. Howell determined for plaintiff to undergo a bone density scan. Plaintiff was also referred to a rheumatologist for rheumatoid arthritis. (Tr. 199.)

A bone density scan performed on May 28, 2002, yielded results within the normal range. (Tr. 216-18.)

---

[8]Midrin is used to relieve migraine and tension headaches. Medline Plus (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a601064.html>.

[9]Depakote is an anticonvulsant used to prevent migraine headaches. Medline Plus (last revised Mar. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682412.html>.

Plaintiff visited Dr. Howell on June 10, 2002, and complained of joint pain specifically in the right elbow, knees, ankles, wrists, neck, low back, and upper back. Plaintiff was prescribed Albuterol for asthma. Dr. Howell noted recent laboratory tests to show equivocal ANA results with a rheumatoid factor of 42. It was noted that plaintiff was going to a rheumatologist for arthritis. (Tr. 198.)

Plaintiff visited Dr. Richard M. Di Valerio on July 16, 2002, upon referral from Dr. Howell. (Tr. 160-61.) Dr. Di Valerio noted plaintiff to have had a lot of migraines with intermittent visual loss, as well as a lot of musculoskeletal complaints with arthralgias in her knees, low back and neck. Plaintiff also reported occasional warmth, swelling and arthralgias in her hands. Plaintiff reported generalized fatigue and dizziness, and had complaints of loss of balance. (Tr. 160.) Dr. Di Valerio noted plaintiff's medications to include Depakote and migraine medications. Physical examination was unremarkable. Plaintiff had no obvious joint-centered swelling, warmth or tenderness. Neurologic examination was normal. No edema was noted about the extremities. Dr. Di Valerio noted plaintiff to have an equivocal ANA analysis but to have no obvious stigmata of rheumatoid arthritis on examination. Dr. Di Valerio determined to recheck the rheumatoid factor as well as check anticardiolipins and lupus

anticoagulant. Plaintiff was prescribed Bextra[10] for her musculoskeletal complaints and was instructed to return for follow up in two to three weeks. (Tr. 161.)

On September 4, 2002, plaintiff visited Dr. Harry L. Wadsworth upon referral from Dr. Di Valerio. Dr. Wadsworth noted plaintiff's history of pituitary tumor but noted plaintiff's various examinations and test results to be primarily unremarkable. Plaintiff reported to Dr. Wadsworth that she is tired and weak, but that she feels as though she has always been hyper. Plaintiff reported her memory to be diminished and that she has lapses in recollection lasting from fifteen minutes to two hours. Plaintiff reported having dizziness and migraines, and also reported increased pigment in her face. Plaintiff reported having some patches of hair loss. Finally, plaintiff reported that she experiences mood swings and is impatient. It was noted that plaintiff was not happy with her appointment with Dr. Bortz because he recommended that she see a psychotherapist. Physical examination showed plaintiff to have pressured speech with some flight of ideas. Some thinning hair was noted as well as increased

---

[10]Bextra is a non-steroidal anti-inflammatory drug (NSAID) used to reduce some symptoms caused by arthritis, such as pain, swelling and tenderness of joints. Medications & Drugs, *MedicineNet.com available at* <http://www.medicinenet.com/valdecoxib/article.htm> (last visited Sept. 22, 2010). Bextra has since been removed from the market due to potential cardiovascular side effects. Q&A on the FDA Actions for the Cox-2 Inhibitors & NSAIDs (Suspension of Sales & Mktg. of Bextra, *MedicineNet.com available at* <http://www.medicinenet.com/script/main/art.asp?articlekey=46601>(last visited Sept. 22, 2010).

pigment of the eyes and spots at the base of the neck. The remainder of the examination was unremarkable. Dr. Wadsworth recommended a repeat MRI of the pituitary as well as follow up blood tests. (Tr. 158-59.)

Plaintiff visited Dr. Howell on December 22, 2003, and complained of having pain for four days. Dr. Howell prescribed Levaquin (an antibiotic) and Medrol Dose Pack.[11] Dr. Howell ordered an MRI of the brain for pituitary adenoma. (Tr. 197.)

On January 29, 2004, plaintiff visited Dr. Howell and complained of a rash on her back. Dr. Howell noted an MRI of the brain to show a pituitary adenoma. Laboratory testing was ordered. (Tr. 196.)

An MRI of the pituitary gland performed on February 12, 2004, showed no change of the pituitary microadenoma. (Tr. 212.)

Plaintiff visited Dr. Howell on July 12, 2004, and complained of nausea, dizziness, no appetite, feeling hot and tired, and having no energy. It was noted that plaintiff had lost thirteen pounds within the previous three weeks and had trouble sleeping. Plaintiff was prescribed Wellbutrin.[12] Plaintiff was

---

[11]Medrol is a corticosteroid used to relieve inflammation and to treat certain forms of arthritis. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682795.html>.

[12]Wellbutrin is used to treat depression. Medline Plus (last revised Oct. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html>.

also prescribed Dolobid[13] for rheumatoid arthritis. (Tr. 195.)

Plaintiff visited Dr. Howell on July 29, 2004, and reported that she has had "spells" for three years during which she experiences headaches and then slowly loses consciousness. Plaintiff reported that when she wakes up, she is tired and remains really tired and cold through the following day. Dr. Howell diagnosed plaintiff with complex partial seizure and referred her to a neurologist. Plaintiff also reported swelling with Dolobid. Dr. Howell prescribed Daypro[14] for rheumatoid arthritis. (Tr. 194.)

On June 21, 2005, plaintiff visited Dr. Howell and complained of lightheadedness, dizziness, migraine headaches, and insomnia. Plaintiff also complained of neck pain, shoulder pain, and knee pain. It was noted that plaintiff was taking Wellbutrin. Dr. Howell determined to order laboratory testing with a lupus panel, for plaintiff to wear a twenty-four-hour holter monitor, and for plaintiff to undergo carotid doppler testing. Plaintiff was instructed to return for follow up in two weeks. (Tr. 193.)

X-rays taken of plaintiff's thoracic spine on July 21, 2005, showed degenerative changes throughout the mid to lower thoracic spine. X-rays of the lumbar spine showed mild facet

---

[13]Dolobid is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684037.html>.

[14]Daypro is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Oct. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693002.html>.

degenerative changes but otherwise was unremarkable. (Tr. 166-67.)

On September 9, 2005, plaintiff complained to Dr. Sylvester A. Flotte that during the previous year, she experienced intermittent pain in the lower lumbar area radiating to the right gluteal area and down the right leg. Plaintiff also reported numbness in the fourth and fifth toes of the right foot. Plaintiff had good range of motion and good reflexes. Dr. Flotte determined to get an x-ray and MRI of plaintiff's lumbar spine. Plaintiff was instructed to take Motrin. (Tr. 165.)

On October 31, 2005, plaintiff returned to Dr. Flotte with complaints relating to sinus congestion. Plaintiff was prescribed Allegra-D (an antihistamine/decongestant combination) and a Z-pack (an antibiotic). (Tr. 164.)

In January 2006, plaintiff complained to Dr. Flotte of nasal congestion. Plaintiff was prescribed Cipro (an antibiotic) and Phenergan VC (a decongestant). (Tr. 164.)

On April 10, 2006, plaintiff visited Dr. Flotte with complaints of having a rash "all over." Plaintiff was referred to Dr. Shatz. (Tr. 164.)

Plaintiff visited Dr. Howell on May 15, 2006, and complained of symptoms relating to an upper respiratory infection for which medication was prescribed. Plaintiff also complained of dysphagia,[15] for which Dr. Howell ordered an EGD. (Tr. 299.)

_____

[15]Difficulty in swallowing. <u>Stedman's Medical Dictionary</u> 534 (26th ed. 1995).

On October 12, 2006, plaintiff visited Dr. Howell with complaints relating to oral candida. Medication was prescribed. (Tr. 297.)

On October 30, 2006, plaintiff visited Dr. Howell and complained of joint pain and numbness in the fourth and fifth toes of her right foot. It was noted that plaintiff had a twenty-four-pound weight loss within the last year. Examination of the mouth and skin showed lichens planus. Dr. Howell referred plaintiff to a rheumatologist for evaluation of rheumatoid arthritis. (Tr. 192.) Laboratory testing performed that same date showed an elevated ANA level with a rheumatoid factor of 114. (Tr. 308.)

Plaintiff visited Dr. Howell on November 3, 2006, who noted there to be a new onset of systemic lupus erythematosus. Dr. Howell noted plaintiff to have positive ANA results with a rheumatoid factor of 114. Dr. Howell also noted lichens planus. Plaintiff was started on Prednisone and Dr. Howell determined for plaintiff to undergo an EKG and echocardiogram. (Tr. 191.) An ECG performed that same date showed mild mitral valve regurgitation and trace tricuspid regurgitation. Otherwise, the examination was normal. (Tr. 213-14.) Laboratory testing performed that same date yielded negative results for antibodies indicative of lupus. (Tr. 226.)

Laboratory tests performed on January 9, 2007, yielded negative results for antibodies indicative of Sjogren's syndrome. (Tr. 173.)

Plaintiff visited rheumatologist Dr. Linda M. Hunt on January 26, 2007, upon referral from Dr. Howell. Dr. Hunt noted that plaintiff had been diagnosed with rheumatoid arthritis three years prior when her rheumatoid factor was positive. It was noted that plaintiff had a history of dry eyes and dry mouth and recently developed oral ulcers. It was noted that an examination revealed lichens planus and that Prednisone was given. Plaintiff also reported a history of memory loss, migraines, mini-seizures, and of having had a rash on her back. Plaintiff currently complained of arthralgias, myalgias and severe fatigue. Musculoskeletal examination by Dr. Hunt showed fibromyalgia triggers in all locations, with no joint swelling. Plaintiff's feet were noted to be tender across the metatarsal heads. Dr. Hunt noted that additional lab work showed an abnormal chemistry profile. Dr. Hunt informed plaintiff that she did not have specific antibodies for lupus but that she may have Sjogren's syndrome. Dr. Hunt noted plaintiff to have symptoms of fibromyalgia and Plaquenil[16] was given. Plaintiff was instructed to return in two months for follow up. (Tr. 170-71.)

On January 29, 2007, plaintiff underwent a consultative examination by Dr. Raymond Leung for disability determinations. Plaintiff reported her chief complaint to be lupus, but also reported that she had rheumatoid arthritis and fibromyalgia.

_____

[16]Plaquenil is used to treat systemic lupus erythematosus and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601240.html>.

Plaintiff reported joint pains to every single joint, and muscle pains to her arms and legs. Plaintiff reported that ibuprofen helped. Plaintiff reported that she occasionally uses her husband's cane to "get up and down" and that she uses the cane fifteen to twenty days out of every thirty days. Dr. Leung observed plaintiff not to have her cane at the appointment. Plaintiff reported that she can walk one-half of a block without her cane, and is able to lift five pounds at the most. Dr. Leung noted plaintiff's medication to be Plaquenil. Plaintiff's speech, hearing and understanding were within normal limits. Plaintiff was able to pick up a dime from the table with both hands fairly well. Dr. Leung noted plaintiff to develop moderate pain during the examination accompanied by moaning and groaning. Memory and concentration were noted to be within normal limits. Plaintiff was noted to be irritable. Musculoskeletal examination showed plaintiff's gait to be slow with short strides and minimal limp. Plaintiff was able to walk fifty feet unassisted. Plaintiff had difficulties with heel and toe walking. Plaintiff could not squat. Plaintiff was limited with forward and lateral flexion of the lumbar spine. Plaintiff had tenderness diffusely without any significant difference between trigger points and non-trigger points. Plaintiff had difficulty getting up from her chair and needed assistance getting up from the exam table. Plaintiff had decreased range of motion in the hips and neck. Arm, leg and grip strength was measured to be 4+/5. Plaintiff had full range of

motion of the shoulders despite history of rotator cuff surgery. Plaintiff was able to oppose the thumbs and fingers. There was no muscle atrophy. Neurologic examination was normal, with sensation to light touch and pinprick noted to be within normal limits. Examination of the extremities was normal. Dr. Leung's impression was that plaintiff had lupus. (Tr. 177-81.)

Plaintiff visited Dr. Howell on January 30, 2007, and complained of right flank pain. Dr. Howell noted plaintiff's diagnoses of fibromyalgia, Sjogren's syndrome, lichens planus, systemic lupus erythematosus, and hyperkalemia.[17] Dr. Howell referred plaintiff to Dr. Wadsworth. (Tr. 190.)

A CT scan of plaintiff's abdomen on February 2, 2007, showed post left adrenalectomy, normal right adrenal gland, and a pulmonary nodule in the right middle lobe. A follow up CT scan of the chest was recommended in light of this pulmonary finding. (Tr. 210-11.)

On February 8, 2007, D. Freppon, a medical consultant with disability determinations, completed a Physical Residual Functional Capacity Assessment based upon his/her review of the consultative examination performed on January 29, 2007. In this assessment, Consultant Freppon opined that plaintiff could occasionally lift and carry twenty pounds, and frequently lift ten pounds. It was further opined that plaintiff could stand and/or

_____

[17]A greater than normal concentration of potassium ions in the circulating blood. Stedman's Medical Dictionary 826 (26th ed. 1995).

walk about six hours in an eight-hour workday with unlimited ability to push and/or pull. It was further opined that plaintiff could frequently climb ramps and stairs, balance, kneel, and crawl; could occasionally stoop and climb ladders, ropes and scaffolds; and could never crouch. It was further opined that plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 182-87.) Consultant Freppon noted that although medically determinable impairments were established, plaintiff's symptoms had responded to treatment. (Tr. 187.)

On February 27, 2007, plaintiff visited endocrinologist Dr. Stuart R. Adler for consultation regarding auto-immune rheumatologic conditions and a history of pheochromocytoma, adrenalectomy and possible pituitary tumor. Plaintiff also reported a history of lupus, fibromyalgia, lichens planus, and Sjogren's syndrome. Physical examination was unremarkable. Additional laboratory tests were ordered. (Tr. 257.)

Results of laboratory testing performed on March 8, 2007, were normal and did not raise suspicion for an endocrine diagnosis. (Tr. 256.)

On March 27, 2007, plaintiff visited Dr. Howell with symptoms of an upper respiratory infection. Lichens planus of the mouth was also noted. (Tr. 189.)

Plaintiff returned to Dr. Adler on April 24, 2007, for follow up testing. Dr. Adler noted the laboratory results to be normal and that pituitary testing was likewise normal. Dr. Adler

noted there to be a slight tremor on examination. Plaintiff's reflexes were 2+ and normal. It was noted that plaintiff had lost eleven pounds since the last examination. Additional laboratory tests were ordered, and plaintiff was instructed to return in one month for follow up. (Tr. 255.)

In a letter to plaintiff dated May 31, 2007, Dr. Adler wrote that test results showed an elevated IGF-I level, for which follow up studies for measurement of growth hormone were ordered. Dr. Adler also stated that an MRI of the head would be scheduled given plaintiff's current symptom of headaches. An MRI of the abdomen and adrenal glands was also recommended given plaintiff's current complaints of tachycardia. (Tr. 253, 263, 267.)

An MRI of the brain and brain stem performed on June 7, 2007, showed a small non-enhancing lesion on the left lateral aspect of the sella, most likely a microadenoma; marked left sphenoid compartment sinusitis; and symmetric but heterogeneous appearance of the parotid. (Tr. 304-05.) An MRI of the abdomen performed June 8, 2007, showed left adrenalectomy with no mass identified to indicate recurrence of pheochromocytoma. (Tr. 303.)

In a letter to plaintiff dated June 15, 2007, Dr. Adler reported that results of laboratory tests for growth hormone were markedly abnormal. Dr. Adler opined that the pituitary adenoma was producing growth hormone. Dostinex[18] was prescribed. Dr. Adler

_____

[18]Dostinex is used for the treatment of hyperprolactinemic disorders due to pituitary adenomas. Physicians' Desk Reference 2603-04 (55th ed. 2001).

opined that, given the small size of the pituitary tumor, plaintiff may be "better off" with surgery for complete removal sooner rather than later, even if the condition responded to medical treatment. (Tr. 252.)

In response to results from laboratory testing performed on August 3, 2007, Dr. Adler recommended that plaintiff see a neurosurgeon. Plaintiff was instructed to stop Dostinex. (Tr. 251.)

Plaintiff visited Dr. Howell on August 20, 2007, with complaints of right ear pain and right otitis externa. Dr. Howell noted café-au-lait spots on plaintiff's neck. Dr. Howell also noted plaintiff's conditions of pheochromocytoma, pituitary tumor and acromegaly. (Tr. 296.)

On August 27, 2007, plaintiff visited neurologist Ralph G. Dacey, Jr., upon referral from Dr. Howell and Dr. Adler for evaluation of acromegaly. Plaintiff reported that she thought there had been some changes in her jaw and face. Plaintiff's medical history was described as "complicated." Plaintiff complained of daily migraine headaches, for which Dr. Dacey noted plaintiff to take ibuprofen. Plaintiff reported that she had not experienced any episodes of confusion or lightheadedness within the previous twelve months. Physical examination was normal, including motor examination, reflexes, and gait and station. Dr. Dacey determined for plaintiff to undergo additional testing before discussing the possibility of surgery on the pituitary tumor. Dr.

Dacey explained the risks of such surgery and informed plaintiff that it was not likely that surgery would resolve all of her multiple symptoms because "they may not all be due to an endocrine disorder." (Tr. 301-02.)

Plaintiff visited Dr. Gerald W. Moritz on August 27, 2007, upon referral from Dr. Howell for complaints of hearing loss in both ears. Irrigation of the ears was performed. Plaintiff was instructed to continue with ear drops. It was noted that an audiogram may be scheduled if plaintiff continued to have hearing problems. (Tr. 300.)

Plaintiff returned to Dr. Howell on December 28, 2007, with complaints of lichens planus eruptions in the mouth. Prednisone was prescribed. (Tr. 295.) On January 21, 2008, Dr. Howell instructed plaintiff to continue with her medication. (Tr. 294.)

Plaintiff visited Dr. Howell on March 6, 2008, and complained of ear pain, sinus congestion, and chills. Septra (an antibiotic) was prescribed. Dr. Howell also noted plaintiff to have common migraine headaches and diffuse arthritis of the cervical and lumbar spine, for which Dolobid and Ultram[19] were prescribed. (Tr. 293.)

## IV. The ALJ's Decision

The ALJ found plaintiff to have met the insured status

---

[19]Ultram is used to treat moderate to moderately severe pain. Medline Plus (last revised June 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

requirements of the Social Security Act through March 31, 2009.
The ALJ further found that plaintiff had not engaged in substantial
gainful activity since May 25, 2006. The ALJ found plaintiff's
severe impairments to include degenerative disorders of the spine,
status post right shoulder surgery, rheumatoid arthritis, and
residuals of adrenal mass, but determined that plaintiff did not
have an impairment or combination of impairments which met or
medically equaled an impairment listed in Appendix 1, Subpart P,
Regulations No. 4. The ALJ found plaintiff to have the residual
functional capacity (RFC) to lift and/or carry twenty pounds
occasionally and ten pounds frequently; and to sit, stand and/or
walk for about six hours in an eight-hour workday. The ALJ found
plaintiff unable to climb ropes, ladders or scaffolding; but to be
able to occasionally climb stairs and ramps. The ALJ found
plaintiff unable to do repetitive lifting on the right, and to need
to avoid concentrated exposure to extreme cold, hazards of heights,
and vibration. The ALJ found plaintiff's RFC not to preclude her
from performing her past relevant work as an electrical
salesperson, restaurant manager, and real estate rental agent as
that work is customarily performed in the national economy.
Inasmuch as the ALJ found plaintiff able to perform her past
relevant work, the ALJ determined plaintiff not to be under a
disability at any time from May 25, 2006, through the date of the
decision. (Tr. 4-10.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits

her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v.

Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ erred in his analysis of plaintiff's RFC inasmuch as he failed to consider all of plaintiff's medically determinable impairments, and failed to reconcile his findings that plaintiff could engage in light work with the consultative examiner's contrary findings. Plaintiff also contends that the ALJ erred in his reliance on vocational expert testimony to find plaintiff not to be disabled inasmuch as the hypothetical posed to the expert failed to capture the concrete consequences of plaintiff's impairments.

A.  Medically Determinable Impairments

Plaintiff claims that, in determining plaintiff's RFC, the ALJ erred by failing to consider all of plaintiff's medically determinable impairments. Specifically, plaintiff claims that the ALJ failed to consider plaintiff's well-documented headaches with associated symptoms, and "some form of connective tissue disease, whether that be lupus, Sjogren's syndrome, rheumatoid arthritis or fibromyalgia." (Pltf.'s Brief at p. 11.)

When determining a claimant's RFC, the Commissioner must consider all of the claimant's medically determinable impairments. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). Evidence from

acceptable medical sources is needed to establish whether a claimant has a medically determinable impairment. 20 C.F.R. §§ 404.1513(a), 416.913(a); Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). The impairment

> must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and labora-tory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms[.]

20 C.F.R. §§ 404.1508, 416.908.

The claimant bears the burden of providing such medical evidence to the Commissioner. 20 C.F.R. §§ 404.1512, 416.912.

1. *Headaches*

Plaintiff claims that the existence of her headaches, with associated symptoms of fatigue, loss of balance, and dizziness, is well-documented in the record and that, therefore, it was error for the ALJ not to consider her headaches as a medically determinable impairment.

Plaintiff applied for disability benefits on November 8, 2006, with an alleged onset date of November 10, 2006, as amended. Although plaintiff's headache condition is indeed well-documented as averred by plaintiff, a review of the record shows plaintiff to have primarily suffered and sought treatment for such condition during the period in which she worked, that is, prior to the

alleged onset of her disability, without evidence that the condition worsened during the period of claimed disability.

Plaintiff first reported headaches to Dr. Bortz in February 1999 and thereafter to Dr. Howell in May 1999, with associated symptoms of dizziness, nausea, and tachycardia. Subsequent to her adrenalectomy in July 1999, plaintiff's headaches abated. In 2000, plaintiff made an isolated complaint to Dr. Howell of having a headache. Likewise, in 2001, plaintiff sought treatment on one occasion for recurrence of headaches. During a five-month period from May through September 2002, plaintiff repeatedly complained of and sought treatment for migraine headaches, with associated symptoms of dizziness, fatigue and vision loss. Such treatment during this time included a three-day hospitalization for observation relating to such headaches. Subsequent to September 2002, the record shows no reports of headaches until July 2004 when plaintiff reported to Dr. Howell a three-year history of experiencing headaches. In 2005, plaintiff complained on one occasion of having migraine headaches, with associated lightheadedness and dizziness. No reports of headaches were made in 2006.

In January 2007, subsequent to the November 2006 alleged onset of disability, plaintiff reported to Dr. Hunt that she had a history of headaches. Notably, plaintiff did not make any complaints of experiencing headaches at that time. Indeed, plaintiff made no complaints of active headaches until May 2007 for

which, as noted in August 2007, plaintiff took ibuprofen. The record thereafter remains silent as to the existence of headaches until March 2008 when Dr. Howell prescribed medication for current symptoms.

Plaintiff was last employed in May 2006. As demonstrated above, it appears that plaintiff was able to work with her headache condition prior to May 2006, and indeed worked during the period when the headaches appeared to be most debilitating. Although plaintiff experienced intermittent headaches subsequent to the alleged onset date of disability in November 2006, it cannot be said that four isolated complaints of headaches from June 2005 through March 2008 rise to the level of a medically determinable impairment to be considered for disability. A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam); see also Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). In light of the lack of evidence substantiating the presence of this impairment during the relevant period, the ALJ did not err in failing to find plaintiff's headaches to constitute a medically determinable impairment. Cf. Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993) (ALJ did not err in failing to find that ten-year-old diagnosis of schizophrenia diminished claimant's RFC where there was no current evidence of such impairment); see also Frankl v. Shalala, 47 F.3d

935 (8th Cir. 1995) (error to rely on remote medical evidence to determine RFC; RFC must reflect what work, if any, claimant is capable of performing at time of the hearing).

2.  *Connective Tissue Disease*

As an initial matter, the undersigned notes that the ALJ determined plaintiff's rheumatoid arthritis to constitute a severe impairment.  As such, to the extent plaintiff claims that the ALJ failed to consider a connective tissue disease, such as rheumatoid arthritis, as a medically determinable impairment, plaintiff's claim is without merit.  To the extent plaintiff claims the ALJ should have considered lupus, fibromyalgia and Sjogren's syndrome to be medically determinable impairments, a review of the record as a whole demonstrates otherwise.

First, a review of the record shows plaintiff not to have been affirmatively diagnosed with lupus, fibromyalgia or Sjogren's syndrome.  Such conditions were only suspected.  To the extent physicians' notes indicate the presence of such conditions, a review of the record shows such notes to have been made on the report of plaintiff and not on account of independent examination or diagnoses.  See 20 C.F.R. §§ 404.1508, 416.908 (to be considered as a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms.").  The record is devoid of any medically acceptable clinical and laboratory diagnostic techniques which would establish

- 38 -

such impairments. Indeed, repeated laboratory testing for antibodies indicative of lupus and Sjogren's syndrome consistently yielded negative results. In addition, as noted by the ALJ, Dr. Hunt's equivocal statement that plaintiff exhibited symptoms of fibromyalgia was inconsistent with Dr. Leung's subsequent examination which demonstrated plaintiff to have diffuse tenderness without any significant difference between trigger points and non-trigger points. It is the duty of the Commissioner to resolve conflicts in the evidence, including conflicts in medical evidence. See Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995).

Inasmuch as the evidence fails to establish that the suspected conditions of lupus, fibromyalgia and Sjogren's syndrome constitute medically determinable impairments, the ALJ did not err in failing to consider such impairments in determining plaintiff's RFC.

B.   Findings of Dr. Leung

Plaintiff claims that Dr. Leung found that she "had a mild limp, utilized a cane, was able to lift 5 pounds maximally, had a slow gait with short strides, had difficulty getting up from a chair and need[ed] help getting up from the exam table." (Id. at p. 14.) Plaintiff argues that the ALJ's determination that plaintiff had the RFC to engage in light work runs counter to these findings of Dr. Leung, and that the ALJ failed to reconcile this

inconsistent determination. A review of the record belies plaintiff's claim.

Dr. Leung observed plaintiff's gait to be slow with short strides and minimal limp. Plaintiff had limited range of motion about the hips, neck and lumbar spine. Although plaintiff reported that she used a cane, she did not bring a cane with her to the examination. Plaintiff reported that she could walk half a block without a cane, and Dr. Leung observed plaintiff to walk fifty-feet unassisted. Dr. Leung did not opine that plaintiff needed an assistive device. Nor did Dr. Leung make a finding that plaintiff could lift no more than five pounds. This report instead was made by plaintiff in relating her complaints to Dr. Leung.

A review of the ALJ's decision shows him to have exhaustively addressed and analyzed Dr. Leung's examination of plaintiff, noting specifically that despite reports of pain in every single joint, plaintiff had full range of motion at the elbows, wrists, knees, and ankles; full range of motion in flexion, extension and rotation of the cervical spine; and had minimal limitation at the hips. A review of Dr. Leung's examination also shows plaintiff to have had minimal limitation with lateral flexion of the lumbar spine. Although plaintiff demonstrated greater limitations with lateral flexion of the cervical spine and flexion-extension of the lumbar spine, the ALJ determined these limitations not to be of such a severity indicative of a finding of disability. Indeed, the ALJ noted that x-rays of the lumbar and thoracic spine

showed only mild degenerative changes. In addition, despite plaintiff's history of rotator cuff surgery, plaintiff had full range of motion about the shoulders. With respect to plaintiff's complaint to Dr. Leung of muscle pain in her arms and legs, the ALJ noted Dr. Leung's examination to show no evidence of muscle atrophy and only mild reduction of strength. Plaintiff's reflexes were noted to be normal, and sensation to pinprick and light touch was likewise noted to be normal.

Contrary to plaintiff's assertion, the findings made upon Dr. Leung's examination are consistent with an ability to perform light work with the restrictions as determined by the ALJ, see, e.g., Steed v. Astrue, 524 F.3d 872 (8th Cir. 2008); Masterson v. Barnhart, 363 F.3d 731 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642 (8th Cir. 2003); Ostranski v. Chater, 94 F.3d 413 (8th Cir. 1996), and are likewise consistent with other medical evidence of record (see Tr. 301-02, notes of Dr. Dacey). Light work is defined as work that "requires a good deal of walking or standing, or . . . involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). Light work also involves lifting no more than twenty pounds at a time, with frequent lifting or carrying of objects weighing up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A review of the record as a whole shows the ALJ to have properly determined plaintiff to retain the capacity to perform light work with the additional restrictions that plaintiff not engage in overhead

repetitive lifting on the right; not engage in climbing ropes, scaffolding and ladders, with only occasional climbing of stairs and ramps; and avoid concentrated exposure to extreme cold, hazards of heights and vibration. Nothing in Dr. Leung's examination is inconsistent with these findings, and plaintiff has presented no medical evidence demonstrating otherwise.

The undersigned also notes that plaintiff's primary use of ibuprofen, an over-the-counter pain reliever, suggests that the severity of her pain is not so great as to preclude light exertional type work. Ostranski, 94 F.3d at 418 (citing Shannon v. Chater, 54 F.3d 484, 487 (8th Cir. 1995)). Cf. Tilley v. Astrue, 580 F.3d 675, 680 (8th Cir. 2009) (substantial pain management with trigger point injections, narcotic pain medications, sleep aides, and muscle relaxers consistent with inability to perform light work).

Finally, plaintiff contends that Dr. Leung's observation of plaintiff's difficulty getting up from a chair and her need for assistance to get up from the examining table raises significant questions regarding her ability to bend, stoop, crouch, kneel, and crawl, but that the ALJ failed to include such limited postural activities in his RFC finding. Limited bending and stooping is not inconsistent with the ability to engage in light work. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Nor does a person need to crouch to perform substantially all light jobs. Id. "Similarly, the inability to crawl is of little significance in the

world of work." Id. (citing Social Security Ruling 85-15 at 18 (1985)). As such, the ALJ's failure to refer specifically to plaintiff's ability or inability to engage in such activities does not detract from his conclusion that plaintiff can engage in light work. Id. at 841-42.

"Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). The ALJ's RFC determination here is sufficiently supported by the medical evidence. Because the determination is supported by substantial evidence on the record, plaintiff's claim otherwise should be denied. See Steed, 524 F.3d at 875.

C.    Vocational Expert Testimony

Once it is found that there is substantial evidence on the record as a whole to support the ALJ's decision concerning a claimant's disability, the five-step analysis need go no further. Lewis, 353 F.3d at 648 (citing Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998)). Where a claimant has the RFC to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled. Masterson, 363 F.3d at 737 n.2. Vocational expert testimony is not required at Step 4 where the claimant retains the burden of proving she cannot perform past relevant work. Lewis, 353 F.3d at 648 (citing Banks v. Massanari,

258 F.3d 820, 827 (8th Cir. 2001) (en banc); <u>Gaddis v. Chater</u>, 76 F.3d 893, 896 (8th Cir. 1996); <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1024 (8th Cir. 1994)).

At Step 4 of the sequential analysis, the ALJ here found plaintiff's RFC not to preclude her from performing her past relevant work as it is generally performed in the national economy. As discussed <u>supra</u> at Section V.B, this determination is supported by substantial evidence on the record as a whole. As such, because the ALJ's disability determination at Step 4 was supported by substantial evidence on the record as a whole, vocational expert testimony was not required. Therefore, plaintiff's claim here that the ALJ posed a defective hypothetical to the vocational expert is moot and need not be considered by this Court. <u>Lewis</u>, 353 F.3d at 648; <u>see also</u> <u>Masterson</u>, 363 F.3d at 740 n.5.

## VI. Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may exist in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); <u>see also</u> <u>Flynn v. Astrue</u>, 513 F.3d

788, 795 (8th Cir. 2008). Accordingly, the decision of the Commissioner denying plaintiff's claims for benefits should be affirmed.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE


Dated this  _22nd_  day of September, 2010.